638 N.W.2d 23 (2002)
2002 ND 9
In the Matter of the Application for DISCIPLINARY ACTION AGAINST Paul T. CRARY, a Person Admitted to the Bar of the State of North Dakota.
Disciplinary Board of the Supreme Court of the State of North Dakota, Petitioner,
v.
Paul T. Crary, Respondent.
No. 20010200.
Supreme Court of North Dakota.
January 15, 2002.
*24 Loralyn Kay Hegland, Assistant Disciplinary Counsel, Bismarck, for petitioner.
Paul T. Crary, Fargo, pro se.
PER CURIAM.
[¶ 1] Disciplinary counsel filed a petition for discipline against Paul T. Crary. Crary contested the allegations of misconduct and a hearing was held before a hearing panel. The hearing panel issued its report on July 31, 2001, recommending that Crary be disbarred and that he be ordered to pay restitution to the victim. Crary failed to file a brief with this Court opposing the recommendations.[1] We adopt the recommendations of the hearing panel and order that Crary be disbarred, that he pay restitution, and that he pay the costs of the disciplinary proceedings.

I
[¶ 2] Paul Crary has been admitted to practice law in North Dakota since 1965. In 1997, Crary's wife became acquainted with 85-year-old Mary Harris. In August 1997, Harris asked to meet with Crary to prepare a new will. Crary drafted a will for Harris, and Harris also signed documents giving Crary power of attorney. Although Harris was not related to the Crarys, over the next two-and-one-half years Crary and his wife provided general *25 assistance to Harris, including bringing her meals, taking her to medical appointments, and visiting her regularly.
[¶ 3] In December 1997, Crary drafted a codicil to Harris's will. The codicil provided that Crary's wife would receive one-half of any funds which Harris's estate received from insurance companies, including annuities, life insurance policies, and other benefits. Crary's wife also was to receive a grandfather clock under the codicil to Harris's will.
[¶ 4] Harris also asked Crary to help with her investments. In September 1997, Crary assisted Harris in purchasing a $42,000 annuity from the Independent Order of Foresters ("IOF"). In December 1997, Crary had Harris purchase a $10,000 annuity from IOF. In January 1998, Crary assisted Harris in cashing out an existing $100,000 annuity she had purchased just over a year earlier from Bankers Life and Casualty. Harris received approximately $92,000 in proceeds from the Bankers Life annuity, and used those funds to purchase a $90,000 annuity from IOF. Throughout this series of transactions Crary never told Harris he was an agent for IOF and received commissions on the annuities she purchased.
[¶ 5] In September 1998, Harris gave Crary a check for $3,500. A note on the memo line of the check indicated it was a loan to Crary. Harris testified Crary promised to repay the loan within six months with eight percent interest. Crary never repaid the $3,500 to Harris.
[¶ 6] The relationship between Harris and the Crarys eventually soured, and in January 2000 Harris terminated Crary's legal representation. In October 2000, disciplinary counsel filed a petition for discipline, and a hearing panel was appointed. Following a hearing, the hearing panel concluded that: (1) the $3,500 payment to Crary was a loan which constituted a prohibited transaction in violation of N.D.R. Prof. Conduct 1.8(a); (2) the annuity purchases upon which Crary received commissions were prohibited transactions under N.D.R. Prof. Conduct 1.8(b); and (3) Crary's drafting of the codicil devising property to his wife was a prohibited transaction under N.D.R. Prof. Conduct 1.8(c). The hearing panel recommended that Crary be disbarred and ordered to pay restitution to Harris.

II
[¶ 7] We review disciplinary proceedings de novo on the record under a clear and convincing standard of proof. In re Dvorak, 1998 ND 134, ¶ 15, 580 N.W.2d 586; In re Lamont, 1997 ND 63, ¶ 8, 561 N.W.2d 650. In the context of disciplinary proceedings, de novo means we accord due weight to the findings, conclusions, and recommendations of the hearing panel, but we do not act as a mere rubber stamp. In re Howe, 2001 ND 86, ¶ 6, 626 N.W.2d 650. We consider each case on its own facts to decide what discipline is warranted. Id. Because the hearing panel had the opportunity to hear the witnesses and observe their demeanor, we accord special deference to its findings on matters of conflicting evidence. Id.

III
[¶ 8] The hearing panel found that Harris loaned $3,500 to Crary, that Crary failed to advise Harris she could consult another attorney about the transaction, and that Crary never repaid the $3,500. The panel concluded this transaction violated N.D.R. Prof. Conduct 1.8(a), which provides:
(a) Except for standard commercial transactions involving products or services that the client generally markets to others, a lawyer shall not enter into a *26 business, financial or property transaction with a client unless:
(1) The transaction is fair and reasonable to the client; and
(2) After consultation, including advice to seek independent counsel, the client consents to the transaction.
[¶ 9] Harris testified that Crary asked to borrow the money and said he would pay it back within six months with eight percent interest. She also testified he did not advise her to consult another attorney about the transaction. The check bears the notation "Lone [sic] to Paul Crary" on the memo line, and Harris testified she wrote that notation.
[¶ 10] When Crary was asked at the hearing whether he advised Harris to seek independent counsel when he received the $3,500, he replied:
A. I don't recall telling her to seek another attorney about the $3,500. I tolddo recall telling her to seek another attorney about anything that I was doing, you know.
Q. Okay. So then
A. I mean, I recall telling her that she could seek another attorney if she wanted to. I don't remember how many times I said this, but
Q. Okay. But specifically in regard to this $3,500, which she indicates on the check is a loan, you did not tell her before she gives you this money she should go talk to another attorney?
A. Well, I don't recall telling her that, no.
[¶ 11] At the hearing, Crary admitted that he asked Harris for the $3,500. When asked whether the $3,500 was a loan, Crary responded:
A. Well, at theI don't remember at the time exactly how I looked at it, but when I started looking at my out-of-pocket expenses on the thing, I could see where it couldn't have been a loan, because I had out-of-pocket expenses of several thousand dollars on this deal.
Crary's response suggests that, in hindsight, he believed he was entitled to keep the $3,500 as compensation for the personal services and expenses he and his wife had provided to Harris. Although it is clear from the record that Crary and his wife did provide personal services to Harris, the record is equally clear that there was no agreement, express or implied, for payment for those services. Nor did Crary argue the $3,500 was for legal services or expenses he had provided.
[¶ 12] On this record, we agree with the hearing panel's finding that the $3,500 was a loan to Crary at his request, that Crary did not advise Harris to seek independent counsel before entering into the transaction, and that Crary never repaid the loan. Crary's conduct violated N.D.R. Prof. Conduct 1.8(a).

IV
[¶ 13] The hearing panel found that Crary, while acting as Harris's lawyer and with power of attorney, had Harris cash in other annuities and investments to purchase annuities from IOF without advising Harris that he was an agent for IOF and would receive commissions on those transactions, and without advising her to seek independent legal advice about the transactions. Disciplinary counsel argues Crary's conduct violated N.D.R. Prof. Conduct 1.8(b), which provides:
(b) Except as permitted or required in Rules 1.6 and 3.3, a lawyer shall not use information relating to representation of a client to the disadvantage of the client for purposes of furthering either the lawyer's or another person's interest unless after consultation, including advice *27 to seek independent counsel, the client consents.
[¶ 14] Harris testified that Crary never told her he worked for IOF and received a commission on these transactions, and did not advise her to seek independent legal advice about the transactions. Crary testified Harris "must have known" he was an agent of IOF because he filled out the applications with her:
Q. Now as I indicated before, you've also admitted that you were an agent for the Independent Order of Foresters and that you got commissions on the three annuities that were purchased from that company?
A. Well, I had a license to sell for the Independent Order of Foresters, yes.
Q. Okay.
A. And the commissions, I think, were 1 percent.
Q. Now since you were an agent for that company and making commissions on the purchase of those annuities, did you tell Mary that you worked for that company?
A. Well, she must have known that. I mean, Ishe filled out the application. I told her it was Order of Foresters. I don't recall specifically saying I work for this company, but I had the applications there and it said Order of Foresters right on it. And whether I said I worked for this company or not, I can't remember, but it was obvious that I must have if I had the applications there.
Q. How would that be obvious to her just based on the application in your possession?
A. Well, we filled out the application.
Q. Okay.
A. And I told her it was the Order of Foresters, I believe. I don't remember the exact wording.
Q. But you don't recall specifically telling her that you were an agent for that company and that you got commissions on the purchases?
A. Well, I don't recall specifically telling her that, no.
[¶ 15] Crary's assertion that Harris "must have known" he was an agent of IOF and receiving commissions merely because he procured the applications and assisted Harris in filling them out is not plausible. It would be commonplace for a person acting as counsel, and with power of attorney, to provide such assistance without being an agent of the company from which the annuities were being purchased. We agree with the hearing panel's findings that Crary did not advise Harris he was an agent of IOF, did not advise her he received commissions on the transactions, and did not advise her to seek independent counsel. Crary's conduct violated N.D.R. Prof. Conduct 1.8(b), because he used his knowledge of Harris's financial situation and her desire to find another investment to her disadvantage for his own personal profit.

V
[¶ 16] The hearing panel concluded that Crary's drafting of the codicil to Harris's will violated N.D.R. Prof. Conduct 1.8(c), which provides:
(c) A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, unless the client is related to the donee.
[¶ 17] There is no dispute that Crary drafted the codicil, and that the Crarys were not related to Harris. The codicil to *28 Harris's will created a testamentary gift to Crary's wife of one-half of the value of "all moneys and funds which my estate shall receive from all insurance companies, including but not limited to, annuities, life insurance policies and any other benefits." Crary's wife was also to receive a "large Grandfather's Clock." At various times after Harris signed the codicil the values of her annuities ranged between $130,000 and $180,000. Crary conceded in his testimony at the hearing that his wife's one-half testamentary interest in the annuities was "substantial."
[¶ 18] At the hearing, Crary suggested the codicil was prepared at Harris's request. When asked whether he told her she could consult another attorney, he responded, "I think I told her she could talk to someone else."
[¶ 19] Unlike the prohibitions in N.D.R. Prof. Conduct 1.8(a) and (b), Rule 1.8(c) creates a bright-line rule. See In re Boulger, 2001 ND 210, ¶ 7, 637 N.W.2d 710. Disclosure of the conflict to the client and advising the client to consult independent counsel are immaterial to a violation of N.D.R. Prof. Conduct 1.8(c). Courts interpreting other states' adoptions of Rule 1.8(c) of the Model Rules of Professional Conduct have held that the rule creates a strict and explicit prohibition against attorneys drafting documents which result in a substantial gift to the attorney or the attorney's parent, child, sibling, or spouse. See, e.g., In re Polevoy, 980 P.2d 985, 988 (Colo.1999); In re McCann, 669 A.2d 49, 55 (Del.1995); In re Herbert, 553 N.E.2d 130, 131 (Ind.1990); In re Gillingham, 126 Wash.2d 454, 896 P.2d 656, 663-64 (1995); see also American Bar Association Center for Professional Responsibility, Annotated Model Rules of Professional Conduct 128 (3d ed.1996). Noting that Rule 1.8(c) "flatly prohibits a lawyer from preparing an instrument giving the lawyer a testamentary gift from a client" and "does not include any disclosure or fairness provisions," Gillingham, 896 P.2d at 663 n. 9, the Supreme Court of Washington concluded:
Gillingham evidently made the 1987 revisions to Liebel's will pursuant to her instructions. Nevertheless, the fact remains that the RPC explicitly prohibit exactly what Gillingham did, whether or not it was according to Liebel's instructions. Unlike the other rules governing conflicts of interest, the prohibition on testamentary gifts which are drafted by the lawyer-beneficiary does not include an exception when the client gives informed consent. Compare RPC 1.8(c) with RPC 1.7; RPC 1.8(a), (b), (f), (g). Furthermore, Liebel's instructions may have been much different had she been given the benefit of independent counsel.
Gillingham, 896 P.2d at 663-64 (citation omitted).
[¶ 20] Even prior to the adoption of N.D.R. Prof. Conduct 1.8(c), this Court had cautioned about the inherent conflicts presented when an attorney drafts a will which will result in a personal benefit:
Although Amundson's open and candid approach has merit, he misconceives the purpose of insisting the client see another attorney. The purpose is that the client have independent advice and counsel. If, after receiving that independent advice and counsel, the testator remains steadfast in the desire to name the attorney as a beneficiary in the will, there should be little doubt that the will expresses the intent of the testator. Such a procedure not only is to the benefit of the client but will avoid the appearance of professional impropriety and promote public confidence in our legal system and the legal profession as required by Canon 9, Code of Professional Responsibility.
*29 In re Amundson, 297 N.W.2d 433, 441-42 (N.D.1980).
[¶ 21] Similarly, the purpose of N.D.R. Prof. Conduct 1.8(c) is to require that a client actually receive independent legal advice before executing a document giving the attorney, or close family member of the attorney, a substantial gift. See Comment to N.D.R. Prof. Conduct 1.8(c) ("If effectuation of a substantial gift requires preparing a legal instrument such as a will or conveyance, however, the client should have the detached advice that another lawyer can provide."); see also Boulger, 2001 ND 210, ¶¶ 7, 11, 637 N.W.2d 710.
[¶ 22] We conclude Crary's conduct violated N.D.R. Prof. Conduct 1.8(c).

VI
[¶ 23] Our determination of the appropriate sanction for a lawyer's violation of the Rules of Professional Conduct is governed by the North Dakota Standards for Imposing Lawyer Sanctions. Factors to be considered when an attorney has acted with a conflict of interest are set out in N.D. Stds. Imposing Lawyer Sanctions 4.3:
4.3 Failure to Avoid Conflicts of Interest. Absent aggravating or mitigating circumstances ... the following sanctions are generally appropriate in cases involving conflicts of interest:
4.31 Disbarment is generally appropriate when a lawyer, without the informed consent of client(s):
(a) engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client;....
4.32 Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.
[¶ 24] In this case, the presence of numerous aggravating circumstances tips the scales in favor of disbarment. Standard 9.22, N.D. Stds. Imposing Lawyer Sanctions, lists factors which may be considered in aggravation to justify an increase in the degree of discipline to be imposed:
Aggravating factors include:
(a) prior disciplinary offenses;
(b) dishonest or selfish motive;
...
(d) multiple offenses;
...
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of victim;
(i) substantial experience in the practice of law;
(j) indifference to making restitution.
[¶ 25] Crary has a prior disciplinary offense. In 1994 he received a private reprimand for failing to adequately communicate with a client, failing to maintain proper trust records, and failing to provide an accounting to a client. Crary's conduct in handling Harris's affairs demonstrates a dishonest and selfish motive. Crary committed multiple offenses in his representation of Harris. Crary refuses to acknowledge the wrongful nature of his conduct, including belatedly suggesting, after he had failed to repay the loan, that he was entitled to keep the $3,500 for his expenses in providing personal services to Harris. Crary's victim was particularly vulnerable: an eighty-five-year old woman who had recently suffered a stroke and who was apparently dependent upon the Crarys for her personal needs. Crary had substantial experience in the practice of law, having been admitted since 1965. Finally, Crary *30 showed indifference toward restitution, refusing to repay the loan and never offering to repay the commissions he earned on the sale of annuities to Harris.
[¶ 26] Crary has failed to file a brief with this Court, and has not called our attention to any mitigating factors. We have reviewed the mitigating factors under N.D. Stds. Imposing Lawyer Sanctions 9.32 and find none which apply on the face of the record.
[¶ 27] In light of the nature of Crary's conduct and the presence of significant aggravating factors, we order that Crary be disbarred. We further order that Crary pay restitution to Harris and pay the costs of the disciplinary proceedings, and we remand to the Disciplinary Board for a determination of those amounts.
[¶ 28] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, WILLIAM A. NEUMANN, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.
NOTES
[1] After the hearing panel issued its report, Crary sent a letter to the Secretary of the Disciplinary Board tendering his resignation from the bar. An attorney's resignation does not halt pending disciplinary proceedings. See N.D. Stds. Imposing Lawyer Sanctions 9.4(d) (resignation prior to completion of disciplinary proceedings is neither an aggravating nor a mitigating factor in imposing disciplinary sanctions); In re Hoffman, 1999 ND 122, ¶ 25, 595 N.W.2d 592; In re Leier, 1997 ND 79, ¶ 7, 562 N.W.2d 741.